A95A0256. ELECTRONIC DATA SYSTEMS CORPORATION
v. HEINEMANN et al.
(459 SE2d 457)

BIRDSONG, Presiding Judge.

On June 16, 1994, appellant Electronic Data Systems Corporation (EDS) filed suit against its former employees and Mark E. Heinemann, Patricia G. Pelling and their company PowerPlan Consultants, Inc., for breach of employment contracts including solicitation of employees and customers, competition, and use of confidential and proprietary information; misappropriation of corporate opportunities; intentional interference with existing and prospective business relationships; unfair competition; and breach of fiduciary duty.

EDS contends appellees formed PowerPlan Consultants immediately upon their departure from EDS; that appellees admit they are soliciting EDS's customers so as to sell EDS's customers a computer software system which is intended to compete directly with the "capital asset tracking" software system which appellees were developing for EDS before they resigned from EDS; that, e.g., on the day after they resigned from EDS, appellees responded on behalf of their new company (PowerPlan) to a request for proposal sent to EDS by one of EDS's customers which appellees had failed to answer on behalf of EDS before resigning from EDS; and that appellees admit they "target" customers who appellees knew had expressed an interest in EDS's software system.

Appellees answered and asserted claims for declaratory judgment, injunctions, and other claims. Thirty-four days after the law-

suit was filed, they filed a so-called "Motion for Interim Relief" containing Heinemann's and Pelling's affidavits and a "Statement of Material Facts Not in Dispute." Appellees sought an "interim" declaration that they do not violate their EDS employment contracts and do not misuse trade secrets or violate a duty regarding corporate opportunities. They sought an injunction restraining EDS from invoking their contracts to prevent customers from considering appellees as vendors, contending that unless such relief were granted they would suffer immediate danger of irreparable harm. The legal grounds asserted for this "Motion for Interim Relief" were OCGA §§ 9-4-1 through 9-4-10 (the Declaratory Judgment Act) and OCGA § 9-11-56 of the Civil Practice Act (the summary judgment law).

The motion for interim relief, which appellant EDS calls a "procedural anomaly," was heard August 18, 1994. On that day, appellees presented to the trial court an order on motion "for declaratory policy on partial summary judgment." The order as presented states: "This court has considered defendants' motion for interim relief, and briefs, depositions, affidavits and oral argument in support thereof and opposition thereto. Treating the motion as one for declaratory *policy* [emphasis supplied] on partial summary judgment, this court hereby ORDERS as follows . . . *Covenants Not to Compete* 2. The nonsolicitation covenants in Mr. Heinemann's contract (Section 6) and the nonsolicitation covenants and covenant not to compete in Ms. Pelling's contract (Section 6) do not include software that would be used for tracking capital assets. 3. Defendant Pelling's covenant not to compete is void under Georgia law. *Trade Secrets* 4. There is no evidence that defendant's capital asset tracking system contains any proprietary software that would constitute trade secrets of plaintiff EDS. 5. Defendants state their intention to continue to develop their capital asset tracking system without use of such trade secrets; if they do so, EDS has no claim against them for violation of EDS trade secrets. SO ORDERED, this 18th day of August, 1994." From the bench, the trial court struck the word "policy" in the order's preamble, wrote in the word "judgment," and signed the order.

Enumerating ten errors, EDS contends the remedy of an "interim declaratory judgment" is alien to Georgia law and is unavailable under the Declaratory Judgment Act, and the procedure for summary judgment was not followed; and that the trial court's rendition of judgment on this anomalous motion was error for it ignored non-discretionary procedural requirements, ignored the existence of hotly disputed facts, and rendered an advisory opinion. Appellees respond that appellant EDS is a large company headquartered in Texas, formerly headed by H. Ross Perot, and has revenues of $8 billion per year as opposed to appellees' "fledgling" business. Appellees also allege "intimidation" by EDS in that at Pelling's deposition, EDS's

lawyer wore a tie figured with razor blades. *Held*:

1. Appellees contend EDS has the "view" that the trial court "was powerless to do anything on an expedited basis." This is not true. EDS argued that the procedure invoked by appellees to get "interim declaratory judgment" is improper as it would not terminate the proceedings in final judgment as contemplated by OCGA § 9-4-8; that the preliminary injunction sought by appellees is not designed to preserve the status quo as in the usual procedure but asks the court to terminate the lawsuit; that appellees did not properly move for summary judgment under OCGA § 9-11-56 (c); that the suit had been filed less than two months prior to this motion and discovery, though intensive, was not complete, and the affidavits and evidence show issues of fact "literally abound"; and that the trial court should postpone any summary judgment until further discovery.

Appellees also contend EDS claimed it could not arrange an examination of the product being developed. This is not true. Appellant's president stated in affidavit that "due to the time constraints imposed by . . . this expedited hearing on defendants' motion for interim relief . . . EDS has been unable to retain an expert to perform the necessary technical analysis on defendants' PowerPlan product. Although [appellees say it] was developed 'from scratch' without use of any confidential, proprietary, or [trade secrets], EDS believes the circumstantial evidence suggests otherwise. [Affidavit cit.] . . . EDS requests sufficient time to develop direct evidence on these issues."

It is also not true, as appellees assert, that in EDS's view there was no procedural vehicle to bring the matter to a head before trial. EDS plainly acknowledged that summary judgment may be appropriate if proper procedure is followed.

2. Assuming, as has been held, that a trial court may sua sponte grant summary judgment even where no such motion is pending, it may do so only " 'provided the grant is proper in all other respects' [cit.]," including procedural notice and opportunity to respond. *Spivey v. Safeway Ins. Co.*, 210 Ga. App. 775 (1) (437 SE2d 641). What appellees asked for in their motion for "interim relief" was not an injunction to maintain the status quo while the issues were discovered and tried, but a court order phrased by appellees as a "declaratory *policy* on partial summary judgment" (emphasis supplied), which would prevent EDS from pursuing its lawsuit altogether, without even giving EDS the rights and notices of a summary judgment proceeding.

3. At the outset of the hearing on appellees' motion, the trial court inquired whether appellees' attorney was "trying to get the injunction." That attorney responded: "In the nature of an injunction, yes, sir." He then stated that appellees "need the guidance of this court on the issue whether EDS can hold this lawsuit they've filed

against Mark and Pat over their heads and effectively drive them out of business before the case comes up for trial. So it's a motion for interim relief." He then instructed the trial court on appellees' "capital asset tracking" system as being a sophisticated system to account for assets of a public utility for shareholder reports, general accounting, budgeting, compliance with Federal Energy Regulatory Commission annual reports, work management, tax returns, SEC filings, and other matters. He then argued that EDS's mere filing of this lawsuit would put appellees out of business if "interim relief" were not granted because utility companies would not deal with appellees under shadow of a lawsuit; that EDS's superior financial position enables it to delay any resolution; and that appellees were asking "for an early declaratory judgment probably in the nature of a partial summary judgment and we [followed] the summary judgment proceedings. . . . We're asking for an early declaratory judgment . . . that the covenants not to compete do not prohibit [appellees] from developing and selling a capital asset tracking system."

These representations operated unfairly to gain an advantage to which appellees were not entitled. The trial court in a case involving restrictive covenants is without authority to adjudicate with finality contested issues of fact on an interlocutory basis. The trial court may resolve, on an interlocutory basis, questions of law (*Uni-Worth Enterprises v. Wilson*, 244 Ga. 636, 640 (261 SE2d 572)) but not questions of disputed fact, of which many remain in this case.

4. The trial court erred in holding that the covenants in appellees' contracts "do not include software that would be used for tracking capital assets." This is a disputed issue. Contrary to paragraph 2 of the order signed by the trial court, the covenant not to compete in Heinemann's contract includes "computer software for use primarily in the public utility industry to develop utility rate structures . . . financial forecasts" and other specifically named functions which may in fact include a capital asset tracking system; this description on its face would seem to include appellees' product as described by appellees' attorney. At least a factual question exists on the point, as made out by affidavits already filed.

5. The trial court erred in ruling, as to the appropriation of trade secrets, that there was "no evidence that defendants' capital asset tracking system contains any proprietary software that would constitute trade secrets." This is a disputed question of fact.

6. The trial court erred in declaring that if defendants "continue to develop their capital asset tracking system without use of such trade secrets . . . EDS has no claim against them for violation of . . . trade secrets." This is an advisory opinion based on an erroneous and premature conclusion that appellees' product contains no trade secrets, and it is an improper attempt to preclude future causes of

action.

7. Even assuming appellees properly moved to enjoin enforcement of these restrictive covenants, the trial court's rulings as to the factual scope of the covenants not to compete and the issue of trade secrets were improper attempts to issue summary judgment on disputed issues of material fact. The trial court has authority to convert an application for interlocutory injunction to a motion for summary judgment, but it cannot do so without complying with OCGA § 9-11-56 (c) and without an opportunity for a hearing on summary judgment. *Charming Shoppes v. Black*, 252 Ga. 207 (312 SE2d 604). The transcript of the hearing on appellee's "motion for interim relief" shows that there was no opportunity for a summary judgment hearing in this case, and no application of summary judgment standards. The issues whether appellees' software violates the nonsolicitation clauses in their covenants not to compete or contains trade secrets are in strong factual dispute. If appellees believed they were entitled to declaratory relief and summary judgment, they should have filed those proceedings in accordance with established procedure and conducted the hearing with full notice to EDS of a motion for summary judgment.

8. Pelling's covenant not to compete by soliciting current customers of EDS is not void and unenforceable as a matter of law. This issue is to be determined in a specific factual situation and according to the nature of the contract terms; the question whether the covenant is reasonable involves an examination of time limits, territorial limits, and restricted scope of activity. *Annis v. Tomberlin &c. Assoc.*, 195 Ga. App. 27, 30 (392 SE2d 717). Pelling's covenant not to compete is not unreasonable as a matter of law as to duration (18 months), as to territorial limitations (designated locations where EDS's competitors are located), and as to activity (rendering the same services she rendered EDS). See *W. R. Grace & Co. v. Mouyal*, 262 Ga. 464 (422 SE2d 529). Her participation in Heinemann's alleged violation of his covenant not to compete may also be actionable.

9. The anomalous procedure pursued by appellees 34 days after EDS filed its lawsuit seems plainly designed to thwart discovery and interrupt the orderly process of litigation while obtaining a "court order," which appellees could show to prospective customers, stating appellees' product does not contain trade secrets. The result of this procedure by appellees, in addition to any actual damage to EDS, is an excess expense upon EDS of appellate cost and excess litigation in this court. Such tactics violate the orderly court process and are not justified by the relative corporate wealth of EDS or the style of its attorneys' neckties.

*Judgment reversed. Pope, P. J., Andrews, Johnson and Blackburn, JJ., concur. McMurray, P. J., concurs in judgment only. Beas-*

*ley, C. J., Smith and Ruffin, JJ., dissent.*

SMITH, Judge, dissenting.

I must respectfully dissent because of the procedural implications of the majority opinion, particularly with regard to the function of partial summary judgment and the trial court's discretion to govern discovery under OCGA § 9-11-56 (f).

First, it is beyond question that all parties treated the appellees' motion as one for partial summary judgment. Although the style of the motion itself is unusual, "[w]e have long ago departed that realm of law where runes and sigils supplant reason and substance." *Tuggle v. Tuggle*, 251 Ga. 845 (310 SE2d 224) (1984). Appellees filed a statement of material facts "in support of their Motion for Summary Judgment" as required by Uniform Superior Court Rule 6.5 and relied upon OCGA § 9-11-56. EDS acknowledged in its briefs that the motion was one for summary judgment and filed the appropriate responses. EDS and appellees repeatedly referred to summary judgment before and at the hearing. While EDS contended a motion for partial summary judgment was inappropriate, it cannot contend it was unaware of the nature of the motion until the time of the hearing. As the majority opinion acknowledges, EDS is incorrect in its assertion because partial summary judgment can be appropriate in a declaratory judgment action.

The majority opinion places great reliance on a typographical error of one word in the proposed order presented *after* the hearing. The motions and briefs, however, clearly recognize the relief sought and granted. By correcting an obvious typographical error, the trial court did not grant relief other than that sought by the parties. Moreover, it is clear from the transcript that both parties understood that this was a mere correction of a scrivener's error. Appellant did not object at the time and raised none of the arguments made in the majority opinion with respect to this minor error, either at the hearing or in its brief on appeal.

Contrary to the majority's assertion, this limited ruling does not dispose of the entire case. It reserves ruling on many other allegations made by EDS. It appears that the trial court confined its ruling to three limited, simple issues appropriate for partial summary judgment: 1. Did the noncompetition agreements executed by appellees with their previous employer, EMA, contemplate or include the development of a capital asset tracking ("CAT") system? 2. Was the Pelling noncompetition agreement void? and 3. Did EDS present any evidence that its proprietary software was used in appellees' CAT system?

It appears from the record that the contents and scope of CAT systems are governed strictly by federal regulation. Whether *data*

available to appellees during their time at EDS could be used in a CAT system is irrelevant to whether the CAT software *itself* was contemplated by the noncompetition agreement, or whether EDS's *software* was used by appellees. The officer who negotiated and signed the noncompetition agreement on behalf of EMA testified unequivocally that the agreement did *not* contemplate including a CAT system. The affidavit of an attorney who did not testify that he drafted these particular agreements is merely a legal opinion as to the meaning of the language and cannot contradict the testimony of the parties to the agreement. It also appears that neither EMA nor EDS had a CAT system at that time.

Moreover, the determination that EDS had failed to bring forward evidence of its claim that appellees used its proprietary software is within the trial court's exercise of its discretion to limit the evidence presented under OCGA § 9-11-56 (f). In my view, this is crucial to the analysis of the trial court's actions governing discovery on this issue. Because EDS was the original plaintiff and initiated this action, it should have had some evidence before filing in order to proceed in good faith. Yet the uncontradicted evidence is that EDS repeatedly refused opportunities to examine the software to see if it used EDS material or data, refused to mediate the dispute, failed to conduct discovery that would have resolved this issue, and failed to hire an expert in a timely manner to examine the software. These actions or refusals to act began shortly after appellees formed their company and before suit was filed. The grant or denial of a continuance under OCGA § 9-11-56 (f) is a matter within the discretion of the trial judge, and this court will not interfere with the exercise of that discretion unless clearly abused. *Wilson v. Tara Ford, Inc.*, 200 Ga. App. 98, 101-102 (3) (406 SE2d 807) (1991).

If the trial court's discretion is limited in the manner suggested by the majority opinion, it is possible that a party could avoid the application of OCGA § 9-11-56 (f) by refusing to conduct discovery and then contending that partial summary judgment cannot be granted because there is a dispute as to some easily settled fact. The wholly conclusory affidavit of EDS's president demonstrates this as he speculates on matters that could have been easily determined by an early examination of the allegedly offending software. This issue amounts to a discovery dispute and is clearly a matter for exercise of the trial court's discretion under OCGA § 9-11-56 (f).

It also appears that the trial court did not err in its ruling on the Pelling noncompetition agreement. The agreement forbids working within a 25-mile radius of 12 cities throughout the United States, although Pelling never worked in most of those cities. It also forbids the provision of services which Pelling never performed and solicitation of 100 listed customers, many of them individuals for whom Pel-

ling never performed work. While the agreement appears at first glance to be limited to "the services that Employee performs for Company (as set forth in Section 6.1 (a))," an examination of Section 6.1 (a) shows that it defines those services in a circular fashion as "any of the products and services that the Company provides to its Customers." Several leading cases have made clear that such agreements must be analyzed in terms of work the particular employee has done for the employer, not the scope of the employer's business. Agreements forbidding more are void for overbreadth. See, e.g., *Wiley v. Royal Cup*, 258 Ga. 357, 358-359 (1) (370 SE2d 744) (1988) (overbreadth of territorial list); *Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 377 (1) (297 SE2d 473) (1982) (overbreadth of client list).

In virtually every lawsuit, the parties disagree on the speed with which it should be resolved. This conflict is as old as the litigation process itself, and trial courts must have some means available to resolve it. This is particularly true when the party seeking to delay resolution is the party that initiated the action. The trial court has discretion to narrow issues for trial and to regulate discovery to move the case forward, and we should not lightly interfere in such matters. For these reasons, I respectfully dissent.

I am authorized to state that Chief Judge Beasley and Judge Ruffin join in this dissent.

DECIDED JULY 13, 1995.

*King & Croft, F. Carlton King, Jr., Terrence L. Croft, Thomas A. Croft*, for appellant.

*Smith, Gambrell & Russell, Thomas W. Rhodes, William W. Maycock, Robert P. Brown, Jason S. Bell*, for appellees.